UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE ) RETIREMENT SYSTEM, Board of Trustees, ) 26000 Evergreen Road, Southfield, MI 48037, ) on Behalf of Itself and All Others Similarly ) Situated, ) <br><br> )<br> Plaintiff, )<br> )<br> vs. )<br> )<br> COGENT COMMUNICATIONS )<br> HOLDINGS, INC., DAVID SCHAEFFER, )<br> and THADDEUS G. WEED, )<br> )<br> Defendants. )<br> )<br> ) | Civil No. <br><br> <u>CLASS ACTION</u> <br><br><br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff City of Southfield Fire and Police Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Cogent Communications Holdings, Inc. ("Cogent" or the "Company"), Company releases and presentations, transcripts of Company conference calls, and media and analyst reports about the Company and its business.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Cogent common stock between February 29, 2024 and May 1, 2026 (the "Class Period"), against Cogent and certain of its officers and directors for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

3.      Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Cogent has offices in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

- 1 -

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

5.      Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Cogent.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cogent common stock was a success, as it: (i) deceived the investing public regarding Cogent's prospects and business; (ii) artificially inflated the prices of Cogent common stock; and (iii) caused plaintiff and other members of the Class (defined herein) to purchase Cogent common stock at inflated prices.

## THE PARTIES

6.      Plaintiff City of Southfield Fire and Police Retirement System, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Cogent common stock during the Class Period and has been damaged thereby.

7.      Defendant Cogent Communications Holdings, Inc. is a Delaware corporation that is headquartered in Washington, D.C.

8.      Defendant David Schaeffer ("Schaeffer") founded Cogent in 1999 and served as Cogent's Chief Executive Officer ("CEO") and Chairman of its Board of Directors during the Class Period.

9.      Defendant Thaddeus G. Weed ("Weed") served as Cogent's Chief Financial Officer during the Class Period.

10.      Defendants Schaeffer and Weed (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Cogent's quarterly reports, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and releases alleged herein to be false and misleading prior to or shortly after their issuance

- 2 -

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, Schaeffer and Weed knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Cogent's Business

11. Cogent is one of the largest carriers of internet traffic in the world. The Company is a global facilities-based provider of low-cost, high-speed internet access, private network services, optical wavelength and transport services, and data center colocation space and power. Cogent currently services three customer bases: (i) corporate; (ii) net-centric; and (iii) enterprise.

12. The Company's corporate customers are located in multi-tenant office buildings that typically house professional services businesses, such as law firms, financial services firms, advertising and marketing firms, health care providers, and educational institutions.

13. The Company's net-centric customers include bandwidth-intensive users who leverage Cogent's network to either deliver content to end users (such as web hosting companies and commercial content providers) or to provide access to residential or commercial internet users (such as other internet service providers, mobile phone operators, and cable television companies).

14. Cogent's enterprise companies are large corporations, typically Fortune 500 companies with greater than $5 billion in annual revenue that run Wide Area Networks involving numerous sites.

### The Importance of Cogent's Long-Standing Dividend Policy

15. Cogent is a public company whose common stock trades on the NASDAQ under the ticker symbol "CCOI." During the Class Period and prior thereto, Cogent's quarterly dividend

was a significant factor in attracting and retaining investors due to its high dividend yield (5.5% in 2024 and 9.2% during 2025) and consistent dividend growth.  During the Class Period, Cogent and its executives highlighted the number of consecutive quarters the Company had increased its dividend.  Ultimately, Cogent did so for 52 straight quarters – *13 consecutive years* – with the streak only snapping when the Company slashed its dividend by 98% during the Class Period.[1]

**Cogent Acquired T-Mobile's Unprofitable**
**Wireline Business for $1**

16.    On September 7, 2022, Cogent announced an agreement (which ultimately closed on May 1, 2023) to acquire T-Mobile's wireline business (the "Acquisition").  The Acquisition included T-Mobile's vast North American fiber network, hundreds of buildings and technical sites with significant power capacity, and a sizeable customer base including many large enterprise customers.  The T-Mobile network acquired in the Acquisition by Cogent included approximately 19,000 long-haul route miles of fiber, 1,300 miles of metro fiber, and 16,800 route miles of leased dark fiber.

17.    The wireline business was formerly part of Sprint prior to its merger with T-Mobile in 2020.  Historically, the wireline business provided wireline communication services to domestic and international customers and supported the operation of Sprint's CDMA and LTE cellular networks.  During the first half of 2022, T-Mobile retired Sprint's cellular networks and confirmed that T-Mobile was no longer relying on Sprint's network to support T-Mobile's wireless business.  Shortly thereafter, T-Mobile and Cogent agreed to the Acquisition.

**Key Financial Terms of the Acquisition**

18.    At the time the Acquisition was announced, T-Mobile's wireline business was losing money (with a negative 80% margin) and experiencing declining revenues of over 10% per year for the prior three years.  The wireline business was in such dire straits that T-Mobile sold the

---

[1]    Unless otherwise noted, all emphasis is added and citations are omitted.

business to Cogent for $1 (subject to certain adjustments for net debt and net working capital). To make the deal even more attractive to Cogent, T-Mobile also contracted to pay Cogent $700 million in "IP transit services" for the continued use of the network over the next 54 months, with $350 million of the amount to be paid during the first year (the "IP Transit Services Agreement").

**Cogent's Rationale for the Acquisition**

19.     Although the wireline business was unprofitable and deteriorating rapidly, Cogent claimed the deal offered the Company sufficient strategic, technical, and long-term financial benefits, including *inter alia*:

- An increased nationwide fiber network footprint that would be owned in fee simple rather than leased from third parties for finite terms;

- Entry into the North American market for high-margin optical wavelengths,[2] then-estimated at $2 billion annually and expected to grow at 7% per year for the next six years;

- Integration of Cogent's network with Sprint's wireline network, which would substantially expand Cogent's footprint;

- Network integration that would result in the elimination of redundant locations, many of which were leased;

- The acquisition of over 400 buildings and technical sites, over 40 of which could be repurposed as data center facilities to support Cogent's new wavelength business;

- The acquisition of legacy Sprint's customer base;

- The ability for the Acquisition to be accretive to EBITDA per share and cash flow per share over a multi-year period through additional revenues, cost synergies, operational efficiencies, and margin improvements; and

- The ability "to strengthen Cogent's commitment to sustaining its record of sequential dividend growth."

---

[2]    Optical wavelengths are essentially dedicated lanes within optical fiber that are used for high-bandwidth, low-latency point-to-point data transmission.

20.     In sum, Cogent claimed the Acquisition would meaningfully bolster its business, as the Company would manage the decline of the existing wireline business by pruning unprofitable contracts while increasing operational efficiencies and repurposing acquired physical assets to meet emerging demands for high-margin optical wavelength and transport services, such as from artificial intelligence ("AI") companies and data center businesses.  In this way Cogent would transform itself from a pure-play internet service provider to one additionally offering high-capacity, long-haul optical wavelength services along an expanded network footprint.

**The Success of Cogent's New Optical Wavelength
Business Was Critical to Its Turnaround Plan for the
Wireline Business and the Company's Overall Success**

21.     Between the announcement of the Acquisition and its closing, Cogent provided financial guidance for its integrated operations that represented Cogent would materially improve its revenue growth and profitability within five years of the Acquisition's closing.  Specifically, Cogent stated it was on track to achieve annual revenue growth of 5% to 7% accompanied by an aggregate revenue target of over $1.5 billion by mid-2028.  After achieving initial synergies, EBITDA margin was purportedly on track to expand annually by about 100 basis points.

22.     The lynchpin to achieving these new targets was Cogent's new optical wavelength business.  Cogent repeatedly claimed that its new wavelength business would be an outsized contributor to growth.  On November 3, 2022, for example, during the Company's third quarter 2022 earnings call, defendant Schaeffer set a $400 million annual run rate target for the business by mid-2028, stating:

> *But the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths.  Today that is only an $8 million business [at Sprint]*.
>
> *. . . [W]e anticipate that within 5 years of closing, we can grow that to a $400 million business*.  So, when we add these 3 legs of growth together on a more normalized basis, getting past this initial ramp-up in the wavelength business, we should find the combined company with EBITDA margins in the low to mid-30s

and the ability to grow topline 5% to 7% and the ability to expand margins consistently at about 100 basis points a year.

23.    A year later, during the Company's third quarter 2023 earnings call on November 9, 2023, defendant Schaeffer *increased* Cogent's expectations for the business to an annual run rate of $500 million, stating:

> ***And then to go to answer your question around a 5-year target, and I'm going to use 5 years from closing.  So May of '23 to May of '28.  We anticipate being on a run rate for wavelength sales of approximately $500 million*** and a total run rate for the combined business in excess of $1.5 billion, up from the $1.1 billion of $1.150 billion, $1.2 billion that we're running at right now.

24.    In the Company's annual report on Form 10-K for its fiscal year 2023 filed with the SEC on the first day of the Class Period (the "2023 Report"), the Company stated that most of this growth was to occur in its new wavelength business:

> Management intends to reduce the negative cash flow of the Sprint Business through the payments from the IP Transit Services Agreement, reducing operating costs and ***increasing revenue primarily by providing optical wavelength and optical transport services over our fiber network, including the owned network we acquired with the Sprint Business***.

**Cogent Was Highly Leveraged**

25.    Shortly after the Acquisition's announcement, Cogent reported a gross leverage ratio of 5.31x and a net leverage ratio of 3.93x as of September 30, 2022, with total debt of approximately $1.24 billion and net debt of $914 million against trailing 12-month adjusted EBITDA of about $233 million.[3]  As of March 31, 2023 (the quarter prior to the Acquisition's closing), Cogent reported *increased* gross leverage of 5.47x and *increased* net leverage of 4.46x, with total debt of approximately $1.27 billion and net debt of $1.04 billion.  Given Cogent's leverage, defendants were keenly aware the Company had limited margin for error and required

---

[3]    Cogent defined gross leverage ratio as total debt divided by the trailing last 12 months EBITDA, as adjusted for Sprint acquisition costs.  Cogent defined net leverage ratio as total net debt (total debt minus cash and cash equivalents) divided by the trailing last 12 months EBITDA, as adjusted for Sprint acquisition costs.

its new optical wavelength business to succeed to preserve its credit rating and to maintain its long-standing dividend policy.

**Defendant Schaeffer Was Personally Highly
Leveraged and Highly Dependent on the
Price of Cogent Shares**

26.    Defendant Schaeffer's personal finances rendered him uniquely dependent on the price of Cogent shares.  Defendant Schaeffer had not received a salary since 2015.  Instead of cash, defendant Schaeffer's compensation was almost entirely in the form of Company stock awards that did not vest for years.  In 2024, for instance, defendant Schaeffer received a total compensation package worth approximately $12.7 million.  The cash component for the year was approximately $186,000, which came from a special incentive award linked to the Company's optical wavelength sales.  The remaining 98%[4] of his compensation came in the form of restricted stock awards ("RSAs") that had a total grant date value of approximately $12.5 million and were split about equally between time-based RSAs and performance-based RSAs.  The time-based RSAs included 84,000 shares that vested in 12 equal monthly increments starting on January 1, 2027.  The performance-based RSAs of up to 96,000 shares were eligible to vest on April 1, 2027 based on certain multi-year (2024-2026) performance metrics, half of which were tied to Cogent's annual EBITDA growth rate and half of which were tied to Cogent's total shareholder return.  All awards were earned or vested no earlier than 36 months from the grant date.

27.    Relatedly, defendant Schaeffer's personal fortune largely consisted of two main assets: (i) Cogent stock (he owned approximately 10% of the Company as of February 28, 2024); and (ii) a substantial commercial real estate portfolio consisting mostly of Washington, D.C.-area office buildings.  Over time these two asset classes became inextricably intertwined, as defendant

---

[4]    Defendant Schaeffer also received $6,100 in compensation from employer matching contributions to his 401(k) plan.

Schaeffer pledged many of the Cogent shares he owned as collateral for margin loans that supported his real estate portfolio and covered the taxes on stock awards from Cogent. As a result, defendant Schaeffer had positioned his personal fortune to be vulnerable to significant declines in the price of Cogent shares.

28.    When the COVID-19 pandemic hit, demand for office space plummeted and caused the value of defendant Schaeffer's portfolio to decline rapidly, with the total value of his portfolio dropping from approximately $1.1 billion in 2022 to $500 million by mid-2025 – a $600 million loss. Defendant Schaeffer later recounted: "I had a stable portfolio that was consistently appreciating. And then when Covid hit, the portfolio began to depreciate. . . . The DOGE overhang and the additional pressure that put on the entire market turned the D.C. market from one of the best into one of the worst markets nationally."

29.    When the price of Cogent shares declined precipitously in 2025, defendant Schaeffer faced a margin call he could not meet; and, in August 2025, lenders at JPMorgan Chase & Co. and Royal Bank of Canada seized and promptly sold $82.5 million worth of his Cogent stock. By the end of 2025, Schaeffer had to sell 84% of his stake in Cogent, reducing his ownership in the Company from 10% to 1.5%, in addition to forfeiting his interests in several buildings due to defaults.

**Defendants Fraudulently Misrepresent Demand
for Cogent's Acquired Wireline Business in
Order to Boost the Price of Cogent Stock**

30.    Cogent's turnaround plan for the wireline business was a costly and time-consuming endeavor, requiring tens of millions of dollars of investment by the Company for improvements in network reconfiguration, facility conversions, and optimizations that were designed to enable wavelength sales with improved "provisioning" times (which Cogent hoped to reduce from 120+ days to 14 days). In order for the Acquisition to be successful, and ultimately

accretive to Cogent's earnings, the Company needed to add thousands of paying customers to the acquired network.

31.     Throughout the Class Period, defendants represented that demand for optical wavelengths in Cogent's newly acquired wireline business was exceptionally strong and rapidly growing.  For example, in February 2024, defendant Schaeffer told investors that "[t]he backlog has more than doubled sequentially in the [fourth] quarter [of 2023]."  He continued: "So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300."  Similarly, in August 2024, defendant Schaeffer stated: "We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths."  A company's "backlog" refers to sales orders or indications that remain to be completed.  The robust and rising backlog Cogent claimed to be experiencing during the Class Period therefore indicated strong customer demand, growing sales, and robust future expected revenue.  These and similar comments by defendants reassured investors about the purported financial benefits of the Acquisition, driving the price of Cogent stock to a Class Period high of over $86 per share by November 2024.

32.     Defendant Schaeffer took millions of dollars' worth of loans backed by his substantial Cogent shareholdings.  With these loans, defendant Schaeffer had built extensive real estate holdings and an investment portfolio centered in the D.C. metro area.  While allowing defendant Schaeffer to amass personal wealth, the share pledges placed intense pressure on defendant Schaeffer to maintain or increase the price of Cogent shares.  If the price of Cogent stock fell significantly, defendant Schaeffer risked a margin call that could require him to quickly sell large amounts of Cogent stock, thereby driving down the price of Cogent stock and causing his wealth to drop.

- 10 -

33.     Cogent's SEC filings recognized the risk posed to investors by defendant Schaeffer's pledging activities, stating that "a pledge of a significant number of shares of the Company's stock poses a risk to the Company and its other stockholders should a lender foreclose on the pledged shares and sell all or a significant portion of them in a manner that disrupts the market for the shares." To mitigate this risk, the Audit Committee of Cogent's Board of Directors purportedly reviewed defendant Schaeffer's pledging obligations quarterly and underwent extensive due diligence to evaluate his real estate holdings. The Board of Directors also set various purported limits on defendant Schaeffer's pledging behavior, including a pre-approval process that ostensibly: (i) disallowed more than 5% of the Company's outstanding shares, on a fully diluted basis, to be pledged at any one time absent exceptional circumstances; (ii) disallowed an executive from pledging more than 50% of their personal Cogent holdings absent exceptional circumstances; (iii) considered the amount and type of other assets securing the full recourse loan; and (iv) considered amount of the loan relative to the financial condition of the individual. Applying these and other relevant factors, the Audit Committee added to the already substantial risk created by defendant Schaeffer's pledging activities by allowing him to exceed the numerical limits set by the Company's pledging policy, telling investors "there was not a material risk that he could be forced to sell Cogent shares involuntarily."

34.     Unbeknownst to investors, however, the order backlog that defendants routinely publicized during the Class Period was, by and large, illusory – a fact later confirmed when most of the purported backlog never turned into paying customers even after the Company's network had been fully repurposed. Not only have the Company and its executives subsequently admitted to losing up to **90**% of the purported backlog, they have also admitted that this extraordinary loss was largely "expected." The harm to investors once the truth was revealed was magnified by defendant Schaeffer's highly risky pledging activities, as was reasonably foreseeable and well-

- 11 -

within the predictable zone of risk created by defendants' fraudulent scheme, forcing a fire sale of vast quantities of Cogent stock as a result of lender margin calls on defendant Schaeffer's loans.

35.     Based on defendants' false and misleading statements to investors about Cogent's backlog, customer demand, and the Company's ability to maintain its dividend policy, Cogent's stock price reached a Class Period high of more than $86 per share only to fall to less than $17 per share in the days following the Class Period's end, a decline of more than 80%.  The precipitous decline in the price of Cogent stock as a result of the fraudulent scheme and course of business detailed herein has inflicted substantial economic harm on plaintiff and other members of the Class.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

36.     The Class Period begins on February 29, 2024.  On that date, Cogent issued a release announcing its fourth quarter 2023 ("4Q23") and year-end 2023 ("FY23") financial results.

37.     The Company also held an earnings call that day to discuss its 4Q23 and FY23 results.  On the call, defendant Schaeffer highlighted the Company's significant backlog of optical wavelength orders while discussing the Company's progress in building out its optical wavelength network, stating:

> As of today, we are selling wavelength services in 65 carrier neutral data centers.  With expended provisioning cycles, we can also sell wavelengths and an additional 285 carrier neutral data centers or a total of 360 facilities across North America.  We're generating $3.3 million of revenue from wavelength sales in the previous quarter with 667 discreet installed wavelengths.
>
> ***We have a significant funnel of wavelength orders in the pipeline.  Today, we have a combination of orders signed as well as in our sales funnel of over 2,300 orders***.

38.     When asked about the Company's decision not to break out wavelength sales in the Company's release and the Company's prior statement that wavelength sales would probably be around $20 million per quarter by mid-year, defendant Schaeffer highlighted the purported

doubling of the Company's "backlog" of customer orders for its optical wavelength business, stating:

> So the decision on just not including it in the press release was so we would have a more fulsome opportunity to discuss it in the prepared remarks as we did. I think it is important to be able to disclose both the revenue run rate which was $3.3 million up sequentially and the unit count which was 667. We are still hampered by the number of sites that we can provision. ***The backlog has more than doubled sequentially in the quarter***.
>
> ***So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300. We actually anticipate, based on information from the sales force and our conversations with customers, that we're going to continue to see an acceleration in the order value***. We are frustrated by the amount of time it's taken to [wave] enable sites.
>
> We are still confident by year end that we will be able to have 800 sites that can provision waves with a kind of two-week average provisioning window. We are definitely not there today. ***As a result, we will probably not be on a run rate by mid-year of $20 million of installed business. I think we will have a funnel that will demonstrate that***, but the sheer number of sites that need to be touched and the number of steps that have to be done to convert the former Sprint voice network into a wavelength optimized network is a very daunting task. We are progressing well.
>
> There are over a thousand of our 2000 employees who are almost completely full-time focused on this effort. We absolutely will meet the year end targets, but ***I think by mid-year the funnel will demonstrate that run rate, but it probably will not be provisioned due to these extended provisioning windows in those 285 sites***.

39.     When asked whether he thought Cogent would be able to get through "that 2,300-order backlog by the end of the year" or whether the Company was "finding any customers finding alternative solutions because of the backlog," defendant Schaeffer represented that "most of those orders" will be provisioned, stating:

> So Evan, I think two different things will happen. ***We will provision most of those orders, but there will be some customers who cannot wait***. We are trying to be very transparent with customers, and it's a site-by-site discussion on what that provisioning window will look like.
>
> We know that with the network reconfigurations that we have going on, we'll have more than double the number of sites and a standardized provisioning window by year end. But in the intervening time, if a customer needs to go

somewhere else and we can't provision, we are going to let them out of that obligation. I mean, if we want to do business with them going forward, we need to understand that this is a Cogent problem and not the customer's problem.

Conversely, as we continue to build credibility with customers and we get more sites enabled and shorter provisioning windows, we actually anticipate the pace of that funnel building actually accelerating. ***In the last quarter, it took us basically five months from closing to build a funnel of 1,000. In the last quarter, we got that up to 2,300. And yes, there have been some ball-out, but the net number grew, and I think that will continue to grow***.

As I stated earlier, over the long run, I think it's not healthy to talk about funnels but install revenue. But until we get the network configured correctly and get enough sites where we can provision in an expeditious manner of a couple of weeks, we have to give both customers and investors an understanding of what the backlog looks like. Thanks.

40.    During the call, defendant Schaeffer confidently confirmed that Cogent's wavelength backlog supported the Company's long-term financial targets by reiterating the Company's revenue growth target of 5% to 7% annually along with an EBITDA margin growth target of approximately 100 basis points, stating:

> ***Now for a couple of comments around our long-term targets. Now that Cogent is fully integrated and combined with the Sprint business, we anticipate our long-term average revenue growth to remain between 5% and 7% annually. And we expect our EBITDA margins as adjusted to increase by approximately 100 basis points annually***. This will be impacted in the short term by the step down in payments from T-Mobile.

41.    Also on February 29, 2024, Cogent filed with the SEC its FY23 2023 Report. The 2023 Report, which was signed by the Individual Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $379 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 2023 Report further confirmed that Cogent had the financial wherewithal to pay this dividend purportedly supported by Cogent's business, stating:

*We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next twelve months and beyond the next twelve months if we execute our business plan.*

42.    On May 9, 2024, Cogent issued a release announcing its first quarter 2024 financial results for the three months ended March 31, 2024 ("1Q24"). The Company reported that wavelength revenue during the quarter was $3.3 million and wavelength customer connections increased sequentially from 661 to 693.

43.    Cogent held an earnings call that day to discuss its 1Q24 results. Defendant Schaeffer stated that Cogent would be able to offer wavelength services in over 800 locations in North America with "much more rapid provisioning cycles" by the end of 2024. While acknowledging that not "all" customers may be able to wait for Cogent's ability to provision them, defendant Schaeffer highlighted the Company's purportedly increased wavelength backlog during the quarter, stating:

> The repurposing of the network to sell wavelength or optical transport services is progressing well. And the conversion of former Sprint switch sites and to data centers is also progressing, increasing Cogent's data center footprint and available power.
>
> *We have a significant backlog and funnel of over 2,400 wavelength opportunities.* However, due to these longer provisioning cycles, we are uncertain if all of these orders will remain with us through our ability to provision them.

44.    Defendant Schaeffer similarly represented that Cogent was experiencing stronger than expected customer demand, stating:

> *So first of all, on wavelengths, we continue to grow our funnel. We're actually trying to discourage customers until we can give them more realistic provisioning time lines. The demand for the routes that we have and the data centers that we are targeting is stronger than we had initially expected.* As we outlined, we anticipate the wave business to be about a $500 million run rate business five years after the acquisition.
>
> We were hoping that we could grow that business linearly, meaning it would grow $100 million to $100 million business a year, post-closing $200 million in the second year. And our hope was based on the fact that the limited number of

locations that we initially serve would actually be the locations that the market wanted. ***What we discovered as we began selling was that the wave demand was much more diffused across a much larger number of data centers. It's not that the demand is not there. It's just spread out into facilities that we could not provision. So we do still believe that there will be a $500 million business by run rate of May of '28***.

I know that's a long time and investors want much nearer targets. The reconfiguration of the network is progressing. We are over halfway through bringing on the number of sites that we need. We are not though yet in a position to have the standardized delivery that I spoke about. That will be in place by year-end. We hope that that will allow us to eat into the backlog and to also accelerate new sales as we will be more comfortable in taking those orders with more standardized provisioning windows.

45.    Also on May 9, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("1Q24 Form 10-Q"). The 1Q24 Form 10-Q, which was signed by the Individual Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $382 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 1Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> ***We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan***.

46.    On August 8, 2024, Cogent issued a release announcing its second quarter 2024 financial results for the three months ended June 30, 2024 ("2Q24"). The Company reported that wavelength revenue increased sequentially to $3.6 million and wavelength customer connections increased sequentially from 693 to 754.

- 16 -

47.     Cogent also held an earnings call that day to discuss its 2Q24 results.  On the call, defendant Schaeffer stated that defendants expected wavelength revenues to "materially accelerate starting in early 2025," stating:

> Our wave revenue increased modestly by 9% sequentially quarter-over-quarter to $3.6 million and that represents actually a 128.7% increase on a year-over-year basis.  ***We expect this to materially accelerate starting in early 2025 as we will complete the network integration and optimization for wave services by year-end***.

48.     While updating investors on the status of the Company's network expansion and optimization program, defendant Schaeffer emphasized the Company's increased backlog of 2,700 orders during the quarter, stating:

> As of today, we have connectivity and wavelength capability services in 574 locations.  However, our provisioning cycles remain elongated at about 90 days.  We intend to substantially reduce that provisioning time as we complete the network optimization programs by year-end.  We have sold wavelengths in 156 locations.  By year-end 2024, we expect to be able to offer wavelength services in over 800 North American locations with substantially reduced provisioning cycles.  ***We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths***.

49.     Defendant Schaeffer further represented that Cogent would be better positioned to provision its increasing backlog by year end as it achieved a shorter provisioning cycle, stating:

> We also remain focused on selling to large enterprises and are continuing to grow that business.  We are enthusiastic and optimistic about the addition of optical transport services or wavelengths to our product portfolio and the expansion of our data center footprint.  ***We have a significant backlog and funnel of these wave opportunities at over 2,700 discrete wavelengths***.  And while we have accentuated provisioning cycles, we hope that with the network reconfiguration work, ***we can bring these orders installed in much shorter times by year-end***.  We're diligently working to complete the integration of the Sprint network and the Cogent network and the optimization.

50.     Also on August 8, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("2Q24 Form 10-Q").  The 2Q24 Form 10-Q, which was signed by the Individual Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would

have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . .  Based on current circumstances, we currently plan to continue our current dividend policy."  The 2Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> *We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan*.

51.    On November 7, 2024, Cogent issued a release announcing its third quarter 2024 financial results for the three months ended September 30, 2024 ("3Q24").  The Company reported that wavelength revenue increased sequentially to $5.3 million and wavelength customer connections increased sequentially from 754 to 1,041.

52.    Cogent also held an earnings call that day to discuss its 3Q24 results.  On the call, defendant Schaeffer highlighted the Company's purportedly robust wavelength backlog, stating:

> By the end of 2024, we expect to be able to offer wavelength services in over 800 locations with a much more rapid provisioning cycle. *We have a backlog and funnel of wave opportunities of over 3,400 unique wavelengths*.

53.    While defendant Schaeffer acknowledged that the Company was "not sure all of these orders will, in fact, be installed," he gave no indication that the vast majority of the claimed backlog was illusory, stating:

> *We have a significant wavelength backlog, a funnel of over 3,400 wavelength opportunities.  However, due to our longer provisioning cycles, we are not sure all of these orders will, in fact, be installed*.  We will substantially reduce that provisioning window by quarter end.

54.    Also on November 7, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("3Q24 Form 10-Q").  The 3Q24 Form 10-Q, which was signed by the Individual Defendants, confirmed that the Company expected to continue its dividend policy, stating in

relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . .  Based on current circumstances, we currently plan to continue our current dividend policy."  The 3Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> ***We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan***.

55.    The statements referenced in ¶¶37-54 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)    that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order;

(b)    that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner;

(c)    that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders;

(d)    that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact;

(e)    that Cogent did not have the financial capacity or business fundamentals to maintain its long-standing dividend policy; and

(f)    that there was a material, undisclosed risk that defendant Schaeffer would be forced to sell vast quantities of Cogent stock as a result of his high-risk pledging activities, thereby further depressing the price of Cogent stock in the event the truth regarding Cogent's "backlog," demand issues, and financial position were ever revealed.

56.    On February 27, 2025, Cogent issued a release announcing its fourth quarter 2024 ("4Q24") and year-end 2024 ("FY24") financial results.  The Company reported that 4Q24 wavelength revenue increased sequentially to $7 million and wavelength customer connections increased sequentially from 1,041 to 1,118.

57.    Although Cogent reached its year-end target of having 800 wave-enabled data centers and had reduced its provisioning cycle to 30 days (from 90 days in 3Q24 and 120 days in 2Q24), investors were disappointed with the results.  Cogent's annual revenue run rate was only $28 million – a far cry from the 2028 target of $500 million – and its backlog (as explained on the accompanying earnings call that day) *declined* sequentially from 3,400 in the prior quarter to 2,700 in the fourth quarter.  Cogent management explained that the Company had removed 1,500 orders from its backlog because many orders were more than a year old.  Additionally, growth in wavelength connections slowed from 287 net additions in 3Q24 to 77 net additions in 4Q24.

58.    In response to the news, the price of Cogent common stock closed down $7.65 per share, or 10%, on February 27, 2025 on abnormally high volume.

59.    According to an analyst at TD Cowen, "shares pulled back likely on the weak Waves bookings," explaining investor disappointment further:

> **On the Waves business**, Cogent is clearly off to a slow start by installing just 77 Waves connections (vs. our estimate of 300) and delivering Waves revenue of just $7.0MM vs. our $7.2MM and the St.'s $7.6MM.  Cogent's Wavelength backlog decreased from 3,400 to 2,700 as mgmt. noted that it kicked out 1,500 connections

from the funnel as they became stale and presumably found business elsewhere. With the broader equity markets sensitive around all things AI (whether it was DeepSeek or Microsoft), the Cogent loss of Waves backlog adds more fuel to these skittish concerns. Cogent's prior messaging that it could add 500 connections per month has now become a "show me" having added just 77 connections in 4Q24. Still, mgmt. did reach its target of 800 wave-ready data centers (and will actually have 880 data centers), encouragingly has lowered provision times to just 30 days (and will eventually reach two weeks), and reiterated its long-term Wave revenue target of $500MM by May 2028.

(Emphasis in original.)

60.    A Wells Fargo analyst expressed similar concerns about Cogent's wavelength business, writing: "A mixed print, with revenue declines offset by cost take-out, and wavelength revenues improving at a slower-than-hoped rate. Lots of questions on CCOI's ability to hold EBITDA steady as it awaits a wavelengths improvement and asset monetizations."

61.    Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

62.    For example, during the FY24 earnings call, defendant Schaeffer continued to misrepresent demand for Cogent's optical wavelength services, conceal the true nature of the Company's "backlog," and vastly understate the percentage of purported "orders" unlikely to be provisioned, stating:

> We have actually sold waves and installed them in 280 locations. ***And as we go through our existing sales funnel and backlog, some of those orders have dropped out, and at quarter-end, we still had 2,700 orders in our wavelength funnel***.

63.    Notably, defendant Schaeffer portrayed the Company as being in a position to fill its backlog of orders in a timely and meaningful manner, stating:

> ***We have a significant backlog and funnel of over 2,700 opportunities. While this is down slightly from the previous quarter, it's been due to grooming that funnel. Many of those opportunities have been in the funnel for over a year as we could not provision them***.

*But now with the ubiquitous coverage and the more rapid provisioning cycles, we believe that we will continue to accelerate our wavelength business. We do have reduced provisioning cycles, and we hope to convert many of these opportunities and funnel into installed orders*.

64.    Defendant Schaeffer similarly stated that the pace of backlog installation would increase to approximately 500 waves per month, which would in turn accelerate new orders, stating:

With regard to the pacing of installs, we are ramping up to our full install capabilities.  And we have both the field resources and service delivery coordinators to support the 500 a month.  *The hard part now has been working through the backlog that we have and flushing out which orders are still available for install and in which the customers had to go somewhere else.  And some of these orders have been in the funnel for over a year.  And that is a time-consuming process*.

*And we have groomed the funnel.  It did shrink, even though there were some new orders coming into the funnel.  And now, we expect the funnel to actually accelerate in new order intake as we have demonstrated our ability to install.  I think we're still probably a month or two away from getting to kind of full cadence of 500 installs a month as a result of this grooming exercise because it does take an iterative back and forth with the customer*.

65.    Defendant Schaeffer represented that the wavelength business was still on track to achieve its 2028 financial targets, reiterating the Company's $500 million annual revenue rate and robust customer demand and stating:

*We feel very comfortable about the target that we laid out at the closing of the deal in May of '23 and said within five years, we would be at a run rate of $500 million annually in wavelength sales.  We think that the demand that we have received both in terms of order backlog and continued customer interest gives us a great deal of confidence we're going to make that number, particularly as we prove to the market our ability to actually deliver*.

The fact that there have been some customers in the funnel for over a year that are still taking waves is to me a little surprising, but some of them had enough confidence in us and we have delivered.  For others, I think we have to build credibility and the way we're going to do that is install these waves.  *But we're very comfortable with our $500 million by mid-'28 target for wavelength revenue*.

66.    On February 28, 2025, the Company filed with the SEC its FY24 annual report on Form 10-K ("2024 Report").  The 2024 Report, which was signed by the Individual Defendants,

- 22 -

confirmed that the Company expected to continue its long-standing dividend policy, stating in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years.

*     *     *

> In light of the economic uncertainties associated with the global economy, evolving hybrid work arrangements, the cash flow requirements of the Sprint Business, and the uncertain impact of proposed changes to economic and fiscal policies in the United States and other countries, our executive officers and Board of Directors have continued to carefully monitor our liquidity and cash requirements as well as our capital spending. ***After consideration of these circumstances, we currently plan to continue our current dividend policy***.

67.     The 2024 Report further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> ***We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan***.

68.     The statements referenced in ¶¶62-67 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order;

(b)     that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner;

- 23 -

(c)     that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders;

(d)     that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact;

(e)     that Cogent did not have the financial capacity or business fundamentals to maintain its long-standing dividend policy; and

(f)     that there was a material, undisclosed risk that defendant Schaeffer would be forced to sell vast quantities of Cogent stock as a result of his high-risk pledging activities, thereby further depressing the price of Cogent stock in the event the truth regarding Cogent's "backlog," demand issues, and financial position were ever revealed.

69.     On March 21, 2025, S&P Global Ratings ("S&P") revised its outlook for Cogent Communications Group LLC ("Cogent Group") from stable to negative on weaker credit metrics. Cogent Group is Cogent's primary operating entity and sometimes issuer of debt. In support of its decision, S&P cited concern that Cogent's leverage would remain above S&P's downgrade trigger of 5.25x in 2025 after Cogent increased its leverage to 5.5x in 2024 from 4.3x in 2023. S&P further cited Cogent's flat organic revenue and EBITDA growth, noting that the growth in Cogent's wavelength business was mostly offset by elevated expenses incurred due to Cogent's ongoing data center refurbishment and wavelength enablement.

70.     On May 8, 2025, Cogent issued a release announcing its first quarter 2025 financial results for the three months ended March 31, 2025 ("1Q25"). The Company reported that wavelength revenue increased sequentially to $7.1 million and wavelength customer connections increased sequentially from 1,118 to 1,322.

- 24 -

71.    Investors were again disappointed by Cogent's wavelength business.  Revenues were lower than expected, which had negatively impacted the Company's earnings, margins, and leverage.  Although the Company had expanded its offering of optical wavelength services to over 880 data centers across North America, wavelength revenues only increased by $200,000 from 4Q24.

72.    On the accompanying earnings call that day, defendants made a number of telling admissions that gave investors further pause.  Many wavelength customers were purportedly not ready to accept delivery even though Cogent was ready to provision them.  According to Company executives, Cogent now had the capacity to provision 500 orders per month but only expected to be able to convert 5% of its 3,400 order backlog ("about 160" per month).  In other words, Cogent had more installation capacity than orders that were ready to be installed.  Defendant Schaeffer further admitted that 90% of the 3,400 backlog figure quoted with 3Q24 results "fell out" and that this shocking outcome was "as expected."

73.    In response to the news, the price of Cogent common stock closed down $3.91 per share, or 7%, on May 8, 2025 on abnormally high volume.

74.    A J.P. Morgan analyst expressly linked the stock price reaction to investor disappointment with the results of Cogent's wavelength business, writing: "Cogent's 1Q25 results were fine, but equity investors were underwhelmed with the company's progress on selling wavelength services . . . ."  The J.P. Morgan analyst further explained the market's reaction to the weaker than expected results:

> **But slower than expected wave sales**.  Analyst projections for wave sales in 1Q were $10mn.  But CCOI fell short of that with only $7.1mn in sales.  The sale of wavelengths is a new business for Cogent, and its performance will likely have an outsized impact on how investors view its securities.  Thus, the miss may have been the driving factor behind the company's double-digit stock sell-off following the release of results.

(Emphasis in original.)

75.     Other analysts similarly recognized Cogent's disappointing wavelength results and its importance to the Company's business.  For example, an Oppenheimer analyst observed "[w]avelengths remain [the] key to revenue acceleration and margin expansion the next several quarters; this is ramping but was low in the quarter" and a Deutsche Bank analyst concluded: "Overall, the report was weak with both revenue and EBITDA behind the street.  Wavelength sales growth was lackluster for a second quarter in a row which is somewhat concerning as this is the offset story to inherited Sprint losses."

76.     Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts.  To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

77.     For example, during the 1Q25 earnings call, defendant Schaeffer continued to conceal the true nature of Cogent's backlog and customer demand issues as well as the attendant risks to investors created thereby.  Specifically, defendant Schaeffer emphasized Cogent's purportedly robust wavelength backlog and claimed the Company remained on track to achieve its mid-2028 revenue target of $500 million (*i.e.*, 25% of the $2 billion market), stating:

> We have provisioned and cleaned up our former backlog of wavelength orders.  *We currently have a backlog and funnel of 3,433 wavelength opportunities.  With more wave provisioning experience and the actual ability to deliver services, we now anticipate that between 4% and 5% of this funnel will be installed each month going forward*.  We also expect based on the growth in the sales activity that by year-end, there will be 10,000 unique Wave opportunities in our funnel.  We currently have provisioning capacity to install 500 waves per month.  *We intend to capture 25% of this highly concentrated North American market within three years*.

78.     According to defendant Schaeffer, Cogent had "much more clarity" into its growing backlog, which the Company purportedly expected to grow to 10,000 orders by year-end, stating:

*The funnel that we have now of 3,433 orders is a completely rebuilt funnel that was rebuilt from the end of Q3 2024 to the end of Q1 2025. We now have much more clarity around locations and about timing to be able to install.*

At 883 locations, we can now install in 30 days. We have sufficient field resources, pluggable optics and service delivery coordinators to be able to provision 500 orders a month. *With a 3,400-order backlog in funnel, which represents with a 5% conversion rate about 160.* So, we have more installation capacity than orders that are ready to install.

As we build credibility with customers, we will both see an uptick in the number of opportunities going into that funnel. *Based on the sales forecast that we have, we anticipate that funnel to reach 10,000 from 3,430 by year-end,* so in the next seven months.

79.    To further support this misleading picture of customer demand, Cogent *increased* its long-term guidance for the Company's annual revenue growth rate from a range of 5% to 7% to a range 6% to 8%, as well as the Company's long-term guide for annual adjusted EBITDA margin expansion from a 100 annual basis point increase to a 150 basis point increase. Defendant Schaeffer stated in pertinent part:

Now that the Sprint business is combined with our legacy business, and we have fully analy[z]ed the revenue burn off of undesirable revenues, *we are adjusting our long-term annual revenue growth rates to 6% to 8%, and we are increasing the rate at which we anticipate our EBITDA as adjusted margin to expand annually to 150 basis points.*

80.    On May 8, 2025 Cogent filed with the SEC its quarterly report on Form 10-Q ("1Q25 Form 10-Q"). The 1Q25 Form 10-Q, which was signed by the Individual Defendants, confirmed that the Company expected to continue its long-standing dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $397 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 1Q25 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

- 27 -

> *We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan*.

81. The statements referenced in ¶¶77-80 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a) that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order;

(b) that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner;

(c) that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders;

(d) that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact;

(e) that Cogent did not have the financial capacity or business fundamentals to maintain its long-standing dividend policy; and

(f) that there was a material, undisclosed risk that defendant Schaeffer would be forced to sell vast quantities of Cogent stock as a result of his high-risk pledging activities, thereby further depressing the price of Cogent stock in the event the truth regarding Cogent's "backlog," demand issues, and financial position were ever revealed.

82.     On August 7, 2025, Cogent issued a release announcing its second quarter 2025 financial results for the three months ended June 30, 2025 ("2Q25").  The Company reported that wavelength revenue increased sequentially to $9.1 million and wavelength customer connections increased sequentially from 1,322 to 1,469.

83.     Cogent's 2Q25 results yet again failed to meet expectations.  The Company only added 147 net connections during the quarter (compared to 204 in 1Q25), which was far less than defendants' prior claims that Cogent would be installing 4% to 5% of its 3,433 wavelength backlog (approximately 155 wavelengths) per month.

84.     On the accompanying earnings call held that day, defendant Schaeffer stated that Cogent had installed "several hundred" additional wavelengths during the quarter to customers who were not yet being billed because the customers were purportedly "surprised" by Cogent's quick provisioning times and were not able or willing to accept the service.  In addition, Cogent's gross leverage ratio increased to 8.65x from 6.69x in 1Q25 and its net leverage ratio increased to 7.52x from 6.08x due to debt issued in April and reduced trailing 12 months EBITDA as a result of lower payments by T-Mobile under the IP Transit Services Agreement.  These facts further undermined defendants' claims about Cogent's backlog, customer demand, and the Company's ability to continue its long-standing dividend policy.

85.     In response to the news, the price of Cogent stock closed down $8.54 per share, or 19%, on August 7, 2025 on abnormally high volume, and declined an additional $4.72 per share, or 13%, on August 8, 2025 on abnormally high volume.  Materially contributing to the stock price declines, on these two days JPMorgan Chase & Co. and Royal Bank of Canada seized 2.66 million shares of Cogent stock that defendant Schaeffer had pledged as collateral for loans and drove down the price of Cogent shares by selling the shares *en masse* for a total of $82.5 million.  As defendant Schaeffer later acknowledged, his pledge of shares "created a cascade of bad events."

86.    A BofA Securities analyst explained investor reaction and skepticism to the Company's weak wavelength results:

**Wavelength delays take the full spotlight of the 2Q print**

We reiterate our Underperform rating, lower our PO to $30 (from $50), and adjust our income rating to '8' same/lower from '7' same/higher for CCOI. Focus points on CCOI's 2Q25 results were 1) lack of wavelength business ramp, 2) data center optimization efforts, and 3) capital allocation philosophy. CCOI's wavelength business installed only 147 connections in 2Q (vs. Street expectations of 500). CCOI noted there are several hundred waves connected with customers, but not being billed due to customer capabilities. CCOI continues to shop >100MW of data center capacity to potential buyers at ~$10mn a MW, but a deal remains unstruck much to investors dismay. The CCOI story remains a "show me" story as management has not delivered on its wavelength business ramp, even with the business being fully enabled since 1Q. CCOI's leverage also remains high vs. historic levels and the company quarterly dividend payout is unsustainable at current operating and leverage trajectory.

87.    A J.P. Morgan analyst similarly rebuked the Company's mid-2028 revenue target and openly questioned the Company's explanation for the slow pace of its sales and installations, positing instead that the slower ramp in installs reflected increased competition and "growing pains," stating:

Cogent reported mixed 2Q results with better revenue (improved revenue decline q/q) but weaker EBITDA ($73m vs our $79m) due to lower margins. At the same time, CCOI's (billable) Waves installs were once again weaker than expected as customers were once again unable to accept delivery due to the company's rapid provisioning times. <u>We question this dynamic and believe the slower ramp in installs is reflective of increased competition across the Waves ecosystem as well as growing pains. Accordingly, we lower 3Q25+ install expectations and meaningfully reduce our long-term Waves estimates on the above: we now forecast 2025 Waves revenue of $39m and annualized Waves revenue of $160m by mid- 2028 (vs. management's target of $500m)</u>. Relatedly, while CEO Schaeffer is confident in Cogent's ability to de-lever while increasing capital returns, we question CCOI's decision to begin buying back stock given leverage (6.6x on an adjusted basis exiting 2Q25) and liquidity concerns, and also believe it would be prudent for the company to pause its dividend growth. <u>Questions on Cogent's EBITDA growth algorithm due to pressured legacy trends and a slower Waves ramp as well as diminishing prospects of a data center monetization event near-term will only heighten fears of a pending dividend cut in the coming quarters.</u>

(Emphasis in original.)

88.     Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts.  To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

89.     For example, during the 2Q25 earnings call, defendant Schaeffer highlighted the Company's purportedly robust backlog and shortened provisioning time without disclosing the true state of customer demand and attendant risks, stating:

> As of the end of the quarter, we were offering wave line services in 938 data centers at 10 gig, 100 gig and 400 gig service models, materially, we also have reduced our provisioning intervals for approximately 30 days.
>
> Our wavelength revenues for the quarter were $9.1 million, a 150% increase on a year-over-year basis and a sequential increase of that revenue stream of 27%. As of the end of the quarter, we have sold wavelengths in 418 locations.  ***We currently have a backlog and funnel of 4,687 wavelength opportunities***.

90.     Defendants further attempted to shore up investor confidence by reaffirming Cogent's long-term revenue growth guidance and ***increasing*** Cogent's long-term EBITDA margin expansion guide from 150 basis points per year to an annual increase of 200 basis points, with defendant Schaeffer stating:

> ***We anticipate our long-term average revenue growth to be between 6% and 8%.  And we expect our EBITDA as adjusted margins to expand by approximately 200 basis points annually***.  Our updated revenue and EBITDA guidance targets are meant to be multiyear targets and are not intended to be specific quarterly or annual guidance.

91.     When pressed about Cogent's ability to reach its mid-2028 $500 million revenue target, defendant Schaeffer professed his "confidence" that the Company remained on track with this target, stating:

> ***So first of all, on the confidence on wavelengths, we are actually more confident today than we were on last quarter's call or the quarter before or since we acquired Sprint.  The reception that we have received from the customer base, the orders that we have in our funnel and the customer feedback that we've gotten from the orders that we have installed, all give us confidence that we will reach our $500 million run rate on wavelength revenue by mid-year 2028, which is***

*identical to what we laid out in our justification in September of '22 when we announced the potential transaction that ultimately closed in May of '23.*

92.    Defendant Schaeffer likewise reaffirmed defendants' representation that Cogent would exit the fourth quarter of 2025 with a $20 million run rate in wavelength sales and denied that customers were delaying acceptance of orders due to over-purchasing, stating:

*Yes, we still feel confident that we will hit that quarterly run rate in the fourth quarter.  And I do want to go back to the overpurchasing and delay comment.  That is not what we've heard from customers.  It's really we're just surprised you did it when you said you would do it.*

93.    On August 7, 2025 Cogent filed with the SEC its quarterly report on Form 10-Q ("2Q25 Form 10-Q").  The 2Q25 Form 10-Q, which was signed by the Individual Defendants, reaffirmed Cogent's long-standing dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years. . . .  Based on current circumstances, we currently plan to continue our current dividend policy."  The 2Q25 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

*We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.*

94.    The statements referenced in ¶¶89-93 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)    that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order;

(b)     that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner;

(c)     that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders;

(d)     that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact; and

(e)     that Cogent did not have the financial capacity or business fundamentals to maintain its long-standing dividend policy.

95.     On August 14, 2025, S&P downgraded Cogent Group's issuer credit rating from B+ to B, its issue-level rating on the company's senior secured notes from BB to BB-, and its issue-level rating on the company's senior unsecured notes from B+ to B.  S&P cited among other reasons for its decision: (i) a sharp increase in Cogent's leverage to 7.5x as of June 30, 2025; (ii) S&P's expectation that Cogent's leverage would now remain above S&P's downside trigger of 5.25x through 2026; (iii) wavelength sales that had underperformed expectations; and (iv) the potential for a downgrade within the next 12 months if demand for Cogent's wavelength business failed to materialize.

96.     On November 6, 2025, Cogent issued a release announcing its third quarter 2025 financial results for the three months ended September 30, 2025 ("3Q25").  The Company reported that wavelength revenue increased sequentially to $10.2 million and wavelength customer connections only increased sequentially by 281 connections from 1,469 to 1,750.  These results were so weak that Cogent paused stock buybacks and reduced its quarterly dividend from $1.015

per share to $0.02 per share – a reduction of 98% – ending Cogent's streak of 52 straight quarters of increasing its dividend.

97. On the accompanying earnings call that day, Company executives stated that Cogent would maintain its new dividend policy until it reached a net leverage target of four times EBITDA on a last-twelve-months basis. Defendant Schaeffer additionally acknowledged that he was no longer confident that Cogent would have sufficient paying customers to reach the $20 million revenue run rate previously expected by the end of 2025.

98. In response to this news, the price of Cogent stock declined each day from November 6, 2025 through November 13, 2025, declining from a close of $38.30 per share on November 5, 2025 to a close of $16.68 per share on November 13, 2025, a total decline of $21.62 per share, or 56%, as the market digested the adverse revelations and their impact to Cogent's business and prospects.

99. Analysts sharply criticized the Company's results, with a Wells Fargo analyst cutting his wavelength sales estimates to only $200 million by 2028, less than half the $500 million amount still being quoted by the Company, casting further doubt on the Company's prospects:

> **Dividend cut and buybacks suspended with full prioritization on deleveraging**. CCOI cut its quarterly dividend to $0.02/shr (from $1.015) and temporarily paused stock buybacks. The dividend will remain fixed until the company deleverages to 4.0x (from 7.4x in Q3), which will take significant time unless CCOI executes on significant asset sales. It also creates the pain of transitioning an income-focused shareholder base to a story that still has serious question marks on future growth.
>
> **Wavelength growth remains slower than hoped**. Wavelength revenue was $10.2M in Q3, +12% seq. vs. +27% seq. growth in Q2, with +281 net installs coming in below our expectations. Mgmt also was hesitant on its previous aspiration to reach a $20MM annualized run-rate by Q4. With customers not as prepared to accept services quickly – and a notable competitive response from LUMN and T – we're slashing our waves estimates, including a modest ramp to nearly $200MM by 2028.

(Emphasis in original.)

100. An RBC Capital Markets analyst similarly rejected the Company's $500 million revenue target, stating:

> Wavelength additions at 281 came well below consensus at ~500. In our view, the demand for the wavelength business has not materialized to ramp to 500 monthly installs and eventually hit its $500M wavelength run-rate revenue target by mid-2028. Like the previous quarter, the company installed more wavelengths than customers accepted. For Q4, we expect a marginal improvement in wavelength additions to 400.

101. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

102. For example, on the November 6, 2025 earnings call, defendant Schaeffer highlighted the Company's backlog and claimed that the Company remained on track for its mid-2028 wavelength revenue goals (*i.e.*, 25% of the available market), stating:

> We currently have a backlog and funnel of wave opportunities of 5,221 opportunities. We intend to continue to capture market share and believe our goal of 25% of the highly concentrated long-haul wavelength market in North America in three years is achievable.

103. The statements referenced in ¶102 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a) that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order;

(b) that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner;

(c)    that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders; and

(d)    that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact.

104.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its periodic quarterly and annual financial reports filed with the SEC.  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of these reports, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

105.    Under Item 303, given the importance of Cogent's optical wavelength business to the Company's financial operations and prospects, Cogent's periodic reports were required to describe the known trends and uncertainties relating to the backlog in the Company's wavelength orders, including adverse client demand trends and the high likelihood that these purported orders would never be consummated.  Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Cogent common stock speculative and risky, but were not.  Indeed, the boilerplate risk discussions provided in the Company's SEC filings were *themselves* materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had *already* transpired and therefore posed an imminent threat to the Company's business and operations.  For example, the "Risk Factors" contained in the Company's 2023 Report stated Cogent "*may* not

realize the anticipated benefits of the acquisition of the Sprint Business" and "*may* not succeed" in adding customers, yet failed to disclose that the vast majority of the Company's claimed backlog was illusory and the difficulties the Company was *already* experiencing in adding and retaining customers for its optical wavelength products and services:

> *We may not realize the anticipated benefits of the acquisition of the Sprint Business, and the integration of the Sprint Business may disrupt our business and management*.

106.    Then, on February 20, 2026, Cogent issued a release announcing its fourth quarter 2025 ("4Q25") and year-end 2025 ("FY25") financial results for the three and twelve months ended December 31, 2025.  The Company reported that wavelength revenue increased sequentially to $12.1 million for the quarter and wavelength customer connections increased sequentially by 314 connections from 1,750 to 2,064.

107.    In a break with the Company's prior practice, defendants refused to provide a specific backlog amount on the accompanying earnings call.  When defendant Schaeffer was questioned about the Company's backlog target of 10,000 orders by the end of FY25, Schaeffer explained that the Company was no longer going to provide specific numbers, stating:

> And now, Sam, I'll touch on your waves question.  While we were in the process of enabling the footprint, we felt it was critical to give funnel KPIs to show expressions of interest by customers.  We have tried to be clear with investors that we do not give funnel data routinely for our other products, and we're treating wavelengths now as any other product.  Now we do in our investor presentation typically show both our on-net and off-net conversion rates for the previous quarter. We intend to continue to do that.
>
> *Our funnel is continuing to grow, but we will not be reporting specific numbers*.  But we do anticipate with the footprint that we now have and the credibility that we are earning with existing customers, we are starting to see a larger percentage of their wave opportunities being shown to us for bid.  And as a result of that, we will close more and see further acceleration in the waves business.

108.    In response to the news, the price of Cogent common stock closed down $7.72 per share, or 29%, on February 20, 2026 on abnormally high volume, and the price of the stock closed down $0.72 per share, or 4%, on February 23, 2026 on abnormally high volume.

109.    Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the full truth and the scope of the problems in Cogent's business, operations, and financial condition.

110.    Finally, on May 4, 2026, Cogent issued a release announcing its first quarter 2026 ("1Q26") financial results for the three months ended March 31, 2026.  The Company reported that its wavelength revenue had increased sequentially to $13.6 million for the quarter and that its wavelength customer connections had increased sequentially by just 199 connections from 2,064 to 2,263.

111.    During the corresponding 1Q26 earnings call, defendant Schaeffer conceded: "On wavelength installs, we have seen a variety of customers pushing out their acceptance of wavelengths.  We actually provisioned more wavelengths in the quarter than we did in the previous quarter, but the customers did not accept them.  Decision to push out acceptance is being driven by constraints."

112.    In response to the news, the price of Cogent common stock closed down $6.79 per share, or 29%, on May 4, 2026 on abnormally high volume to close at $16.37 per share – a decline of over 80% from the Class Period high of more than $86 per share.

113.    A May 26, 2026 Morningstar analyst report summarized market sentiment as follows:

> Accelerating growth in the wavelength business is most critical to meeting our growth expectations and moving the shares higher from here.  ***Management has overpromised and underdelivered in this segment*** . . . .

114.    As a result of these serial disclosures, and defendants' fraudulent scheme and course of business during the Class Period, plaintiff and other members of the Class have suffered substantial economic harm.

**ADDITIONAL SCIENTER ALLEGATIONS**

115.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Cogent, or in their own name, during the Class Period were materially false and misleading.    Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.    Defendants, by virtue of their receipt of information reflecting the true facts regarding Cogent and its optical wavelength business, their control over and/or receipt and/or modification of Cogent's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

116.    Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.    The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of Cogent, including the Individual Defendants.

117.    The Individual Defendants, because of their positions with Cogent, controlled the contents of Cogent's public statements during the Class Period and were intimately involved in Cogent's optical wavelength business.    The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

- 39 -

118.    In addition, defendants were highly motivated to conceal the weaknesses in Cogent's new wavelength business.  Cogent was highly leveraged at the time the Acquisition closed.  During the Class Period, Cogent and its subsidiaries conducted debt issuances both to raise new capital and retire outstanding debt, including a $600 million offering in June 2025 of senior secured notes due 2032 whose proceeds were used to repay $500 million senior secured notes due in 2026 and to provide an additional $100 million of liquidity.  Had the true facts about Cogent's wavelength business been known, Cogent's cost of capital would have increased.

119.    Defendant Schaeffer was also highly motivated to conceal the true state of Cogent's wavelength business to preserve his personal fortune.  Defendant Schaeffer was highly leveraged and experiencing significant cash flow pressures during the Class Period that threatened his real estate empire and his sizeable ownership stake in the Company.  His Cogent compensation was almost entirely in the form of stock awards that did not vest for years and which were largely tied to the performance of the price of Cogent shares.  Additionally, defendant Schaeffer's deteriorating real estate portfolio had been propped up by margin loans that he had secured by pledging large quantities of his personal Cogent stock as collateral.  If the price of Cogent stock declined precipitously, his lenders could seize the collateral.  In August 2025, as the truth began to be revealed, this in fact occurred as two lenders seized and promptly sold $82.5 million worth of defendant Schaeffer's Cogent stock, driving down its market price.  In the aggregate, defendant Schaeffer sold over $170 million worth of Cogent stock during the Class Period – far above his historical trading practices.

120.    Moreover, the Individual Defendants had access to internal data and facts making them intimately aware of the true state of Cogent's wavelength business.  Defendant Schaeffer was designated in the Company's SEC filings as the Company's Chief Operating Decision Maker ("CODM").  As explained in the Company's 2024 Report, as CODM, defendant Schaeffer was

responsible for assessing the Company's performance and deciding how to allocate resources. He regularly reviewed documents reflecting the Company's service revenue, network operations expenses, selling general and administrative expenses, interest expenses, and net income and/or loss information. As further detailed in the Company's proxy statement filed with the SEC on March 25, 2024, as a member of the Company's Board of Directors defendant Schaeffer had "carefully monitored the Company's progress on its post-closing integration plans in order to realize the projected synergies of the Sprint acquisition" and was required to "continue to monitor closely the progress of the integration of the Sprint assets." Cogent's proxy statement filed with the SEC the following year on March 26, 2025 likewise confirms that defendant Schaeffer continued in 2025 "to monitor the remaining integration efforts and support management efforts to grow revenue, EBITDA, and free cash flow." Similarly, as Cogent's Chief Financial Officer, defendant Weed was personally responsible for the monitoring, reporting, and forecasting of the Company's business and operations, including with respect to demand for Cogent's optical wavelength business. Indeed, the Company's 2023 Report, 2024 Report, and FY25 annual report on Form 10-K ("2025 Report") confirmed that the Company maintained disclosure controls and procedures that were designed to ensure that the information required to be disclosed in its reports under the Exchange Act was recorded, processed, summarized, and reported and that such information was accumulated and communicated to the Individual Defendants, as appropriate, to allow timely decisions regarding required disclosure.

121. Consistent with their responsibilities as the most senior executive officers of the Company and their access to detailed information concerning Cogent's operations, defendants Schaeffer and Weed routinely held themselves out as persons with knowledge of Cogent's wavelength business, customer demand, and the Company's backlog by discussing these subjects on Company earnings calls. For example, on the Company's 3Q24 earnings call, Weed discussed

the Company's optical wavelength revenue and capital expenditures relating to the integration of the assets acquired from T-Mobile, while Schaeffer discussed the Company's wavelength revenue and backlog. Moreover, the Individual Defendants presented a united front on these matters, routinely using plural pronouns like "we" and "our" to describe what they did or believed, such as when Weed stated: "This earnings conference call includes forward-looking statements, and these forward-looking statements are based upon *our* current intent, belief, and expectations." Similarly, when reporting the Company's financial results Weed used language such as "[*w*]*e* analyze our revenues" and "[w]e are continuing our network integration of the former Sprint network and legacy Cogent network into one unified network."

122. Defendants further had access to specific customer contracts that would include pertinent information such as how long the orders had been outstanding. Defendant Schaeffer repeatedly claimed that defendants were in communication with Cogent's customers about provisioning the Company's backlog. For instance, on the 4Q23 earnings call at the start of the Class Period, defendant Schaeffer stated: "We are trying to be very transparent with customers, and it's a site-by-site discussion on what that provisioning window will look like." Defendant Schaeffer similarly stated on the 3Q24 earnings call on November 7, 2024 in pertinent part:

> ***We continue to talk to the customers that are in our backlog***. And if we can accelerate certain of those orders, we will. ***We also know that some of those orders have been sitting for months***. We have tried to be very transparent with customers in terms of our limitations on hitting what we view as acceptable provisioning windows.

Under the circumstances, it is wholly implausible that defendants were unaware of the true state of Cogent's wavelength backlog.

123. Moreover, given the Individual Defendants' positions at the Company and their roles in the fraud, knowledge of the true facts can be imputed to the Individual Defendants because the fraud relates to Cogent's core operations. As detailed herein, defendants repeatedly

- 42 -

emphasized that the success of Cogent's new wavelength business was critical to its turnaround plan for the wireline business and the Company's financial prospects. Per defendant Schaeffer the "real meteoric growth in the combined business" was expected to come from Cogent's "ability to sell optical transport products or wavelengths." To that end, Cogent stated it had "over a thousand of [its] 2000 employees . . . almost completely full-time focused" on Cogent's wavelength business. Under these circumstances, it would be improbable to suggest that defendants were unaware that the vast majority of Cogent's backlog was insubstantial and not expected to result in paying customers.

124.    In addition, defendants made a number of incriminating admissions that have corroborated their knowledge of material adverse facts concealed from investors. For example, on the Company's 1Q25 earnings call, defendant Schaeffer admitted that defendants expected the vast majority of the 3Q24 wavelength backlog quoted to investors on November 7, 2024 would ***not*** result in paying customers. On the 1Q25 call, Schaeffer confirmed that ***90%*** of the 3Q24 backlog "fell out" and only 10% were "install[ed]" or carried over to future months, stating:

> ***So, we had visibility to starting to tell people we could give them firm delivery dates starting in January, nearly 90% of the total funnel that existed at the end of Q3 2024 fell out. Only about 10% of that funnel, which was about – also about 3,500 ended up either installing or carrying over***.

125.    Defendant Schaeffer further admitted on the call that defendants ***expected*** that level of attrition despite failing to appropriately disclose this adverse fact to investors, stating in pertinent part:

> I'm now going to pivot to your second question, which is Wavelength installation. As we have been very clear in previous discussions with investors, we built a funnel of Wavelength opportunities with no defined installation window. As it became clear that we could begin to install in select locations, in Q3 of 2024, we began the process of cleansing that funnel. ***And as expected, the majority of that funnel fell out***. Those customers went elsewhere, because they could not wait for our deliveries.

126.   Defendant Schaeffer made a similar admission regarding cuts to Cogent's dividend. During a December 8, 2025 UBS investor conference, defendant Schaeffer explained that Cogent cut its dividend due to the Company's increased leverage resulting from the Sprint Acquisition and that this cut was therefore not unexpected, stating in pertinent part:

> We had 52 sequential quarters of growing our dividend and dividing it out more than 100% of cash flow by levering up incremental EBITDA.  Cogent organically grew for 18 years as a public company with no M&A at 10.2% with an average of 220 basis points a year of margin expansion.  ***We took a onetime step back, which was not unexpected***.  We are now actually at a point where top line is growing, and we'll continue to see that 200 basis points of margin expansion.

*     *     *

> So I think there were two key drivers, . . . one ***prior to reporting Q3 it was clear that our dividend had become decoupled from our share price***.  Our dividend yield was nearly 11%.  And therefore, we felt that investors did not believe in the durability of the dividend; two, our aggregate net leverage had increased to a peak of 6.6 times.
>
> ***We felt it was necessary to be able to demonstrate to debtholders that we were serious about returning to the net leverage that we had operated in for 13 years prior to Sprint***.  From 2010 through 2023, we were generally between 3.5 times and 4 times levered and growing our dividend.  Now that our leverage is at 6.6, we need to demonstrate a commitment to delivering.

127.   Likewise, during a March 3, 2026 investor conference, defendant Schaeffer offered a telling mea culpa, admitting in regards to the Company's optical wavelength business: "We also probably made a mistake being too granular around both funnel size and exact progression in a specific product."

128.   Finally, on August 15, 2025, Cogent disclosed in a Form 8-K filed with the SEC that, effective September 2, 2025, James Bubeck was leaving the Company and would no longer serve in his role as Vice President of Global Sales and Chief Revenue Officer.  When the Company had reported 2Q25 results a week earlier, Cogent gave no indication that Mr. Bubeck would be leaving.  This unplanned departure of a senior officer who had direct knowledge of and access to

the facts that were concealed from investors further bolsters an already compelling inference that defendants acted with the requisite scienter.

## LOSS CAUSATION

129.    The market for Cogent common stock was open, well-developed, and efficient at all relevant times.  Throughout the Class Period, Cogent common stock traded at artificially inflated prices as a direct result of defendants' false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiff and other members of the Class purchased Cogent common stock relying upon the integrity of the market price for Cogent shares and market information relating to Cogent, and they have been damaged thereby.  When the relevant truth became known and/or the materialization of the risk that had been concealed by defendants occurred, the price of Cogent common stock declined immediately and precipitously because the artificial inflation was removed from the market price of the common stock, causing substantial damage to plaintiff and the Class, as detailed herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

130.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

131.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Cogent common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Cogent common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)     Cogent regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Cogent was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

132.     As a result of the foregoing, the market for Cogent common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all those who transacted in Cogent common stock during the Class Period suffered similar injury through their transactions in Cogent common stock at artificially inflated prices and a presumption of reliance applies.

133.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Cogent common stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Cogent common stock, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

134.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Cogent

common stock during the Class Period and were damaged thereby as alleged herein (the "Class"). Excluded from the Class are defendants and members of their immediate families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cogent common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Cogent or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

137.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

138.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by defendants as alleged herein;

(b)    whether statements made by defendants misrepresented material facts about the business, operations, and management of Cogent;

(c) whether defendants acted with the requisite scienter; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

139. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

140. Plaintiff incorporates ¶¶1-139 by reference.

141. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Cogent common stock during the Class Period.

143.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cogent common stock.  Plaintiff and the Class would not have purchased Cogent common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

144.    Plaintiff incorporates ¶¶1-143 by reference.

145.    The Individual Defendants acted as controlling persons of Cogent within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Cogent stock, the Individual Defendants had the power and authority to cause Cogent to engage in the wrongful conduct complained of herein.  Cogent controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, designating a Lead Plaintiff and certifying a Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

- 49 -

D.      Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 23, 2026                    SCHERTLER ONORATO MEAD SEARS
                                                                  & MANNING, LLP
                                                                 CHRISTOPHER B. MEAD (D.C. Bar #411598)


                                                                               s/ Christopher B. Mead
                                                                   CHRISTOPHER B. MEAD

555 13th Street, N.W., Suite 500 West
Washington, D.C.  20004
Telephone:  202/628-4199
cmead@schertlerlaw.com

ROBBINS GELLER RUDMAN
     & DOWD LLP
SAMUEL H. RUDMAN
RICHARD W. GONNELLO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
rgonnello@rgrdlaw.com

ROBBINS GELLER RUDMAN
     & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com

Attorneys for Plaintiff

- 50 -

- 51 -

VMT LAW, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Additional Counsel